UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STARPOWER COMMUNICATIONS, LLC,<br>      Plaintiff,<br><br>      v.<br><br>CROWN CASTLE FIBER LLC,<br>      Defendant. | Civil Action No. 25-2582 (JDB) |

## MEMORANDUM OPINION

This is a contract dispute about the installation of fiber optic cable. Starpower and Crown Castle contracted for Starpower to build fiber optic cables in the Washington, D.C., area that Starpower would then lease to Crown Castle on an ongoing basis. The contract soured and Starpower sued Crown Castle, alleging failure to pay invoices, breach of contract, and breach of warranty. Crown Castle now moves to dismiss Starpower's suit.

Starpower plainly states a claim for breach of contract based on its unpaid invoice but fails to state a claim for other contractual breaches or for breach of warranty because it does not point to any specific contractual terms or warranties that Crown Castle is alleged to have breached. Moreover, because the parties contracted to limit liability absent gross negligence or willful misconduct—which Starpower fails to plausibly allege—Starpower fails to state a claim for consequential, indirect, special, or punitive damages. Therefore, the Court will grant in part and deny in part Crown Castle's motion to dismiss.

1

**Background**

I. **The Contract**

In May 2017, Starpower and Crown Castle entered into a fiber optic cable lease agreement for Starpower to build a fiber optic network to connect Crown Castle small cell antenna sites—or nodes—to hubs. Compl. Ex. A ¶¶ 1-2, 4, 13, at 15 (Agreement), Dkt. 1; see also Compl. ¶ 7; Def.'s Mem. in Supp. of Mot. to Dismiss 3 (Def.'s Mot.), Dkt. 8.[1]  In turn, Crown Castle leases those sites to cell-carrier customers. Def.'s Mot. 3.[2] The Agreement was for a term of at least 10 and up to 25 years. Compl. Ex. A. ¶ 12(a).

Under the contract, Starpower was to build 270 segments of cable. Compl. Ex. A, Attach. 5. Starpower was to build the first 100 segments by the end of 2017, 80 percent of the total (i.e., 216 segments) by mid-2018, and all segments by the end of 2018. Compl. Ex. A, Attach. 1 § 3. If Starpower missed a target date by over 30 days "for any reason other than a force majeure event or the wrongful act or omission" of Crown Castle, then Crown Castle would receive $50 per day of delay up to a total of $3,000 per late segment. Id. § 4. Starpower could only begin building a segment upon receipt of Crown Castle's final notice to proceed, which would trigger Starpower "to begin the permitting and construction process." Id. § 2(c); see also Compl. ¶ 16; Def.'s Mot. 3. Changes by Crown Castle to node or hub locations after the final notice to proceed "may result in incremental fees" based on Starpower's "direct, external, out-of-pocket costs reasonably incurred at actual cost plus ten percent . . . ." Compl. Ex. A, Attach. 1 § 2(c) (citation modified).

---

[1] Starpower is a Delaware limited liability company (LLC) with its principal place of business in New Jersey. Compl. ¶ 3. Crown Castle is a New York LLC with its principal place of business in Texas. Id. ¶ 4. Starpower does business as Astound Business Solutions, formerly known as RCN Business. Id. ¶ 3.

[2] In March 2025, Crown Castle announced that it was selling its small cells and fiber solutions businesses. Kritika Lamba and Jaspreet Singh, Crown Castle to Sell Fiber Assets to EQT Active Core and Zayo in $8.5 Billion Deal, Reuters (March 13, 2025), https://www.reuters.com/markets/deals/crown-castle-sell-fiber-assets-two-entities-85-billion-deal-2025-03-13/ [https://perma.cc/DEX9-YPMC]. For now, it appears that Crown Castle still owns this part of its business.

2

Starpower warrantied that it had obtained all "required rights," defined as "any and all agreements, rights, licenses, permits, authorizations, rights of way and easements of every kind and description, including any necessary municipal, state, tribal or federal authorizations such as environmental permits, necessary for the use of the Crown Castle fibers, associated Starpower property or other physical plant facilities, and for the installation, maintenance, use of and access to the Starpower network and Crown Castle fibers . . . ." Compl. Ex. A ¶¶ 23, 27 (citation modified). Crown Castle warrantied that it had obtained "or by the applicable Acceptance Date w[ould] obtain all necessary licenses, permits and authorizations from governmental authorities and third persons required for Crown Castle to conduct the Crown Castle activities authorized and contemplated under th[e] Agreement." Id. ¶ 24. The Acceptance Date for a segment was the earlier of the date that Crown Castle confirmed that the segment met its specifications or 15 days after delivery if Crown Castle failed to reject the segment. Id. ¶ 17.

Payment was structured in three tranches. First, Crown Castle would pay Starpower $67,500 for each segment (Initial Non-Recurring Charge), with half invoiced on or after the date of the Agreement and half invoiced upon the Acceptance Date. Compl. Ex. A, Attach. 2 (Fee Schedule) § 1(a); Ex. A at 1, 15, ¶ 17. Second, Crown Castle would pay Starpower $17,500 for each segment (Subsequent Non-Recurring Charge) on the later of 18 months after the Agreement or completing construction of 80 percent of the segments "scheduled to be constructed hereunder." Compl. Ex. A., Attach. 2 § 1(b). Third, Crown Castle would pay Starpower $150 per month for each segment (Monthly Recurring Charge or MRC). Id. § 1(c).

Crown Castle could terminate the Agreement in whole or in part at its "convenience" upon 30 days' notice. Compl. Ex. A ¶ 12(b). If Crown Castle terminated after acceptance of segments but during the initial 10-year term, Starpower's "sole and exclusive remedy" was to receive a

3

schedule of the unpaid, undisputed MRCs: 100 percent for the first year, 50 percent for the second year, and 25 percent for the other eight years.  Id.  If Crown Castle terminated before acceptance of segments, it was to "reimburse [Starpower] for all documented, direct, external out-of-pocket actual costs plus ten percent" for all costs prior to cancellation, which was also to be Starpower's "sole and exclusive remedy."  Id. ¶ 12(c).  As relevant here, the parties also limited liability for "indirect, special, punitive, or consequential damages" absent "gross negligence or willful misconduct."  Id. ¶ 34.

In the event of invoice disputes, Crown Castle had to pay undisputed amounts and provide a written basis for any dispute.  Id. ¶ 7.  If Starpower determined that the disputed amount was properly invoiced, Crown Castle had to pay that amount plus interest immediately upon receipt of Starpower's notice that the dispute was denied.  Id.  However, if Crown Castle "initiate[d] formal dispute resolution in accordance with the provisions of the Agreement" within 30 days after Starpower's denial in writing, it could continue withholding the disputed amount until formal resolution of the dispute.  Id.  The Agreement's dispute resolution provision states that the parties could "pursue any remedies available at law or in equity not expressly limited by the terms" of the Agreement.  Id. ¶ 11.  The Agreement further provided—and the parties now agree—that it shall be governed by Massachusetts law.  Id. ¶ 49; see also Def.'s Mot. 1; Pl.'s Opp'n ¶ 1.

## II. The Dispute

Crown Castle issued its final notice to proceed as to 46 segments on March 1, 2018, and its final notice to proceed as to the remaining 224 segments on December 11, 2018.  Compl. Exs. B & C.  According to Starpower, it built six segments in 2017, 26 segments in 2018, 15 segments in 2019, 63 segments in 2020, and 84 segments in 2021, totaling 194 segments (72 percent of the

4

270 segments contemplated in the Agreement).  Id. ¶¶ 22-27 & Ex. M at 3.[3]  Starpower also states that Crown Castle had requested 298 changes to node locations by October 2024.  Id. ¶¶ 28-29.  In March 2022, Crown Castle instructed Starpower to stop installation work until further notice.  Compl. ¶ 33 & Ex. D.  Starpower asserts that it was "ready, willing, and able to construct" the segments "at all times."  Id. ¶ 37 (citation modified).

In October 2024, Crown Castle terminated 134 segments after acceptance under section 12(b) of the Agreement and 76 segments before acceptance under section 12(c), totaling 210 segments.  Id. ¶¶ 38-39 & Ex. E.  The next month, Starpower issued Crown Castle a letter estimating that Crown Castle would owe around $4.5 million due to termination, following up a week later with an invoice (2024 Invoice) detailing those charges.  Id. ¶¶ 40-41 & Exs. F, G.  Crown Castle requested documentation for the 2024 Invoice and Starpower provided four Excel workbooks and more granular invoices.  Id. ¶¶ 42-44 & Exs. H, I.

In January 2025, Crown Castle formally disputed the 2024 Invoice in its entirety, following up in early April with a letter denying that Crown Castle owed any money and stating that Starpower actually owed Crown Castle $963,291 related to the early termination.  Id. ¶¶ 45-46 & Ex. J.  Several days later, Starpower partially granted and mostly denied Crown Castle's dispute.  Id. ¶ 47 & Ex. K.  In mid-May, Starpower followed up with a notice of breach and demand for cure.  Id. ¶ 48 & Ex. L.  Crown Castle responded by stating that Starpower owed it $3,987,000 in refunds and credits.  Id. ¶ 49.  Finally, Starpower responded with a letter explaining its position on each invoiced charge and disputing Crown Castle's claims.  Id. ¶ 50; Ex. M.

---

[3] Crown Castle does not appear to take issue with Starpower delivering at least six segments before the first final notice to proceed.  In any event, any legal action must begin within two years after the cause of action arises, Compl. ¶ 11, which would have been by the end of 2019 as to the segments completed in 2017.

Starpower asserts that Crown Castle does not dispute that it owes $67,500 for the second installment of the Initial Non-Recurring Charge for two segments and $407,708 for the early termination fee on the 134 segments terminated under section 12(b) of the Agreement. Id. ¶¶ 51-52. Starpower further argues that, because Crown Castle unilaterally reduced the number of segments to be constructed from 270 to 60, Starpower met the 80 percent completion threshold and is therefore entitled under section 1(b) of the Fee Schedule to the Subsequent Non-Recurring Charge for 159 segments. Id. ¶¶ 55-56.[4] Starpower next claims that it is owed $195,059 in cost reimbursement for node relocations after the final notice to proceed under section 2(c) of Attachment 1 to the Agreement. Id. ¶¶ 57-58. Finally, Starpower contends that Crown Castle owes $970,885 for early termination fees on the 76 segments terminated under section 12(c) of the Agreement. Id. ¶ 59. In total, Starpower alleges that Crown Castle owes it at least $4,423,652. Id. ¶ 60. Starpower also claims that it is owed 1.5 percent interest per month on these overdue amounts, totaling at least $530,000 as of the date of the complaint. Id. ¶¶ 62-64; see also id. Ex. A ¶ 6.

Starpower adds to this tally that the Court should treat the 76 segments terminated before acceptance as delivered because construction was "wrongfully delayed" by Crown Castle, which would bring the total amount of direct damages to $7,826,567. Id. ¶¶ 65-67. Starpower also argues that Crown Castle "intentionally misled Starpower into believing it had a viable deployment plan" for the nodes and segments in the agreement and was "grossly negligent" in its applications to permitting authorities, including through its "failure to demonstrate the absence of any public safety problems," thereby preventing Starpower from timely constructing the network. Id. ¶¶ 68-

---

[4] Crown Castle already paid—and alleges that it is entitled to a refund of—the Subsequent Non-Recurring Charge for 35 of the 194 segments that Starpower says it delivered. See Ex. M at 7 & n.6.

72.  Thus, Starpower tallies up indirect, special, and consequential damages, including $9,450,000 for 25 years of MRCs plus two percent annual increases, and $6,000,000 in cost overruns due to Crown Castle's delays.  Id. ¶¶ 73-75.  Finally, Starpower asserts that Crown Castle's failures led to Verizon taking many node locations, depriving Starpower of a valuable fiber network, leading to lost revenue from follow-on business of $18,462,454 through 2024 and $8,314,368 from 2025 to the end of the 10-year agreement.  Id. ¶¶ 76-83.

Starpower brings three claims here: (1) failure to pay invoice, (2) breach of contract, and (3) breach of warranty.  Id. ¶¶ 85-100.  Crown Castle has moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, arguing that there is no such claim as failure to pay invoice and that Starpower has failed to plausibly allege breach of contract or breach of warranty claims.  Def.'s Mot.  The parties have now fully briefed the motion to dismiss.

## Discussion

Under Rule 8(a)(2), a plaintiff's complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  "To survive a motion to dismiss [under Rule 12(b)(6) for failure to state a claim], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  Courts "must accept as true" all factual allegations but not legal conclusions.  Id.  And courts consider "documents incorporated into the complaint by reference . . . ."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

District courts have jurisdiction over civil actions where the amount in controversy exceeds $75,000 between citizens of different states.  28 U.S.C. § 1332(a).  A corporation is a citizen where it is incorporated and where it has its principal place of business.  Id. § 1332(c)(1).  Venue is proper

7

"in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." Id. § 1391(b)(2). Here, the amount in controversy is over $75,000, the parties are not citizens of the same state, and the events primarily took place in Washington, D.C. See Compl. ¶¶ 1-4. Therefore, the Court has jurisdiction and venue is proper.

Under the Agreement, the Court applies Massachusetts law to this contract dispute. Compl. Ex. A. ¶ 49; see also Def.'s Mot. 1; Pl.'s Opp'n ¶ 1; Milanovich v. Costa Crociere, S.p.A., 954 F.2d 763, 767 (D.C. Cir. 1992) ("Under American law, contractual choice-of-law provisions are usually honored." (citation omitted)); Burke v. Air Serv Int'l, Inc., 685 F.3d 1102, 1107 (D.C. Cir. 2012) (explaining that, under Erie. R.R. Co. v. Tompkins, 304 U.S. 64 (1938), courts apply state substantive law and federal procedural law when sitting in diversity jurisdiction).

### I. Failure to Pay Invoice

Crown Castle's argument that there is no such claim as failure to pay an invoice can be dispensed with summarily. Starpower plainly states a "breach of contract claim based on the failure to pay." Bus. Interiors Floor Covering Bus. Tr. v. Graycor Constr. Co., 235 N.E.3d 263, 225 (Mass. 2024). This claim is as well-recognized under Massachusetts law as it is in other states. And Starpower provides extensive allegations and numerous exhibits in support of its claim that Crown Castle failed to pay an invoice due under the agreement. See Compl. ¶¶ 40-64; Exs. F-M.[5]

### II. Other Breach of Contract

Crown Castle next disputes Starpower's claim that Crown Castle breached the "terms and intentions" of the contract by not having a "viable deployment plan," "negligently fail[ing] to release" segments in a timely manner, and relocating nodes and canceling construction "without

---

[5] Starpower characterizes this alternatively as failure to pay invoice (singular) and failure to pay invoices (plural). Contrast Compl. ¶ 41, with id. ¶ 87. The Court understands that Starpower issued the 2024 Invoice on December 1, 2024, and later provided additional invoices as supporting documents. See id. ¶ 44; Compl. Exs. G-I.

due cause." Compl. ¶¶ 89-94. Crown Castle first contends that the parties' "intentions" are not relevant because the contract includes an integration clause stating that it is the "entire agreement." Def.'s Mot. 10 (citing Compl. Ex. A. ¶ 59; Realty Fin. Holdings, LLC v. KS Shiraz Manager, LLC, 18 N.E.3d 350, 356 (Mass. App. Ct. 2014)). As in Reality Finance Holdings, the execution of this complex written agreement between sophisticated parties covering all aspects of the transaction makes clear that the parties intended the contract to be fully integrated. 18 N.E.3d at 248. And Starpower concedes that the Court should look only at the "four corners" of the Agreement, including its attachments. Pl.'s Opp'n ¶ 33. Thus, the Court will look only at the contract terms in evaluating Starpower's claim of breach.

The parties agree that "[i]n Massachusetts, to state a claim for breach of contract, a plaintiff must allege the defendant failed to perform specific obligations under the applicable agreement." Def.'s Mot. 9 (citing Rodriguez v. Mass. Bay Transp. Auth., 80 N.E.3d 365, 368 (Mass. App. Ct. 2017)); Pl.'s Opp'n 7 (same). Starpower's breach claim for failure to pay the 2024 Invoice is tied to the Agreement's payment and termination terms. But Crown Castle argues that under the Agreement it has no obligation to have a viable deployment plan or to release any segments let alone on a given timeline, that it is expressly allowed to relocate nodes and cancel construction, and that there is no due cause requirement. See Def.'s Mot. 11-12.[6]

---

[6] The Supreme Judicial Court of Massachusetts has construed "due cause" by comparing it to "just cause" and "good cause" and contrasting it with termination "on unreasonable grounds or arbitrarily, capriciously, or in bad faith." Amoco Oil Co. v. Dickson, 389 N.E.2d 406, 408-09 (Mass. 1979). The court held there that due cause was satisfied by a good-faith judgment that a relationship is "insufficiently profitable," at least where the lack of profitability for the terminating party is uncontested. Id. at 410. Separately, it has defined "convenience" as the "quality of being suitable to one's comfort, purposes, or needs." A.L. Prime Energy Consultant, Inc. v. Mass. Bay Transp. Auth., 95 N.E.3d 547, 558 (Mass. 2018) (quoting Morton Street LLC v. Sheriff of Suffolk Cnty., 903 N.E.2d 194, 201 (Mass. 2009). The court explained that "budget constraints" were "sufficient, but not necessary, to justify termination for convenience." Id. at 559. Starpower may have meant to challenge the sufficiency of Crown Castle's invocation of the termination-for-convenience clause, and indeed the underlying reasons for Crown Castle terminating the agreement are not clear from the record. However, Starpower did not do so, instead relying on the notion of "due cause," which is absent from the Agreement.

In response, Starpower simply states that its allegations "should be explored . . . through interrogatories, admissions, document production and depositions." Pl.'s Opp'n 8. But Starpower does not point out any "terms sufficiently complete and definite" that Crown Castle allegedly violated. Rodriguez, 80 N.E.3d at 368 (quoting Targus Grp. Int'l, Inc. v. Sherman, 922 N.E.2d 841, 848 (Mass. App. Ct. 2010); see also id. ("contract terms must be set forth with 'certainty and precision'" (quoting Epstein v. Zwetchkenbaum, 247 N.E.2d 698, 700 (Mass. 1969))). And the Court discerns none either. Accordingly, Starpower fails to state a claim for breach of contract except as to the unpaid invoice.[7]

### III. Breach of Warranty

Finally, Starpower alleges breach of express warranty by misleading Starpower regarding Crown Castle's ability to obtain, and being grossly negligent in obtaining, the necessary licenses, permits, and authorizations. Compl. ¶¶ 97-98.[8] In response, Crown Castle contends that it only warranted as to obtaining authorizations for its own activities and only upon acceptance of the installed segments. Def.'s Mot. 5-9.

In a claim for breach of express warranty, "the duty arises from a contracting party's express agreement to guarantee a particular result." Trs. of Bos. Univ. v. Clough, Harbour & Assocs. LLP, 255 N.E.3d 596, 599 (Mass. 2025). Recall that Crown Castle warrantied that it had

---

[7] Starpower has not alleged breach of the "covenant of good faith and fair dealing," which "is implied in every contract, including contracts between sophisticated business people." Robert & Ardis Found. v. Myers, 48 N.E.3d 442, 449-50 (Mass. 2016) (quoting Weiler v. PortfolioScope, Inc., 12 N.E.3d 354, 361 (Mass. 2014)). That would be a different claim. See Trites v. Cricones, 252 N.E.3d 1051, 1058 (Mass. App. Ct. 2025) (listing claims for breach of contract, breach of warranty of habitability, and breach of implied covenant of good faith and fair dealing).

[8] The complaint does not specify that the warranty was express, but Starpower points to the warranties in section 24 as the support for its claim. Compl. ¶ 96. Breach of implied warranty sounds in tort law because "the duty is imposed by law." Trs. of Boston Univ. v. Clough, Harbour & Assocs. LLP, 255 N.E.3d 596, 599 (Mass. 2025). This breach of warranty action is contractual because "the standard of performance is set by the defendant['s] promises." Id. Moreover, the contract disclaims any further warranties, whether express or implied, including warranties of merchantability and fitness for a particular purpose. Compl. Ex. A ¶ 25.

obtained "or by the applicable Acceptance Date w[ould] obtain all necessary licenses, permits and authorizations from governmental authorities and third persons required for [Crown Castle] to conduct the [Crown Castle] activities authorized and contemplated under th[e] Agreement." Compl. Ex. A ¶ 24. And the Acceptance Date was 15 days after Starpower delivered a segment to Crown Castle. Id. ¶ 17. But Starpower alleges that Crown Castle's failures "prevented Starpower from constructing the network on time." Compl. ¶ 71.

Starpower's theory does not make sense. Crown Castle only warrantied that it would obtain the necessary authorizations to conduct its activities under the Agreement "by the applicable Acceptance Date" (i.e., following receipt of a completed segment). Crown Castle could not have violated that warranty with respect to authorizations that preceded Starpower's construction of a segment. In opposition, Starpower simply points to Crown Castle's timing in issuing the final notice to proceed, observing that it could not move forward until it had received that notice. Pl.'s Opp'n ¶¶ 9-11. Moreover, Starpower notes that when Crown Castle issued a stop-work order, it prevented the Acceptance Date from occurring. Id. ¶¶ 12-13. But the timing of the final notice to proceed has nothing to do with Crown Castle's warranty to obtain necessary authorizations by the Acceptance Date. And, as Starpower acknowledges, Crown Castle could terminate the Agreement in whole or in part at its convenience. Id. ¶ 21; Compl. Ex. A ¶ 12. Thus, Starpower fails to plausibly allege any breach of express warranty.

**IV.   Damages**

Beyond the amounts in its 2024 Invoice, Starpower alleges that it is entitled to "alternative" direct damages from construing the undelivered segments as delivered. Compl. ¶¶ 65-67. Starpower further alleges "[i]ndirect, special, incidental, and consequential damages" from Crown Castle (1) intentionally misleading Starpower into believing it had a viable deployment plan and

11

could secure the necessary authorizations and (2) being grossly negligent in securing those authorizations, in turn leading to cost overruns from delays and depriving Starpower of follow-on business from Crown Castle and other customers.  Id. ¶¶ 68-84.

 Starpower has not invoiced Crown Castle for these sums, which therefore must fall within Starpower's broader breach of contract claim or its breach of warranty claim.  Contrast id. ¶ 88 (specifying sum owed for failure to pay invoice), with id. ¶ 94 (alleging unspecified damages owed for other breach of contract), and id. ¶ 100 (same for breach of warranty).  However, Starpower fails to identify—nor can the Court ascertain—any express contractual provision that would support treating the undelivered segments as delivered.  Nor, as explained above, has Starpower pointed to—or can the Court discern—any such provision to support a breach of warranty claim or a breach of contract claim besides failure to pay the 2024 Invoice.  Moreover, the Agreement explicitly contemplates termination before acceptance and sets out the "sole and exclusive remedy" in that event.  Compl. Ex. A ¶ 12(c).

 More broadly, the Agreement bars recovery of "indirect, special, punitive, or consequential damages" absent "gross negligence or willful misconduct."  Compl. Ex. A ¶ 34.  "Limiting damages . . . where the two parties are sophisticated business entities, and where consequential damages in the event of a problem could be extensive, is a reasonable business practice."  Deerskin Trading Post, Inc. v. Spencer Press, Inc., 495 N.E.2d 303, 307 (Mass. 1986).  Thus, under the Agreement, Starpower must plausibly allege gross negligence or willful misconduct to state a claim of entitlement to damages beyond those expressly provided for in the Agreement.  It has not done so.

 "Gross negligence is substantially and appreciably higher in magnitude than ordinary negligence.  It is very great negligence, or the absence of slight diligence, or the want of even scant

care[,] . . . [and] a manifestly smaller amount of watchfulness and circumspection than the circumstances require of a person of ordinary prudence." Williamson-Green v. Equipment 4 Rent, Inc., 46 N.E.3d 571, 575 (Mass. 2016) (quoting Aleo v. SLB Toys USA, Inc., 995 N.E.2d 740, 752 (Mass. 2013)).  Willful misconduct, in turn, is "much more" than "gross" negligence and "involves conduct of a quasi criminal nature, the intentional doing of something either with the knowledge that it is likely to result in serious injury or with a wanton and reckless disregard of its probable consequences." O'Leary's Case, 324 N.E.2d 380, 384 (Mass. 1975) (citation omitted). Willful misconduct includes "fraudulent representations in knowing disregard of the truth." Anthony's Pier Four, Inc. v. HBC Assocs., 583 N.E.2d 806, 822 (Mass. 1991) (quoting Datacomm Interface, Inc. v. Computerworld, Inc., 489 N.E.2d 185, 197 (Mass. 1986)).

To survive a motion to dismiss for failure to state a claim, a complaint must "state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (quoting Twombly, 550 U.S. at 555).

Here, Starpower simply alleges that Crown Castle intentionally misled it without providing any support for that legal conclusion. Compl. ¶ 68-69. And it offers a single clause to support its gross negligence assertion—that Crown Castle allegedly failed to "demonstrate" to the permitting authorities "the absence of any public safety problems." Id. ¶ 70.  Such threadbare and conclusory statements do not state a plausible claim of either willful misconduct or gross negligence in the face of the parties' express limitation on consequential, indirect, special, or punitive damages.

13

Therefore, Starpower cannot avoid the Agreement's limitation on liability and fails to state a claim for relief beyond the sums it claims it is owed under the 2024 Invoice.

## CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Crown Castle's motion to dismiss.[9]  A separate order will accompany this opinion.

/s/
JOHN D. BATES
United States District Judge

Date: October 27, 2025

---

[9] Unless the dismissal order states otherwise, involuntary dismissal except for lack of jurisdiction, improper venue, or failure to join a party under Rule 19 operates as an adjudication on the merits, i.e., entails dismissal with prejudice. Rollins v. Wackenhut Servs., Inc., 703 F.3d 122, 131 (D.C. Cir. 2012) (citation omitted). However, courts must dismiss claims without prejudice unless amending the complaint would be futile because alleging other facts consistent with the pleading "could not possibly cure the deficiency." See Jefferies v. District of Columbia, 917 F. Supp. 2d 10, 24 (D.D.C. 2013) (quoting Firestone v. Firestone, 76 F.3d 1205, 1209 (D.C.Cir.1996)); Strumsky v. Wash. Post Co., 922 F. Supp. 2d 96, 105-07 (D.D.C. 2013) (discussing Firestone and its progeny).  Starpower theoretically could amend its breach of contract claim to argue that Crown Castle failed to provide an adequate reason to terminate for convenience, its breach of warranty claim to allege facts related to Crown Castle's activities following the Acceptance Date, and its theory of damages by pleading more facts.  Thus, the Court will dismiss these claims without prejudice.